***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Hall. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Hall with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The date of the alleged injury, which is the subject of this claim, is May 26, 2001.
2. The parties hereto are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. That on such date an employer-employee relationship existed between employee-plaintiff and employer-defendant.
4. That on such date, employer-defendant employed three or more employees.
5. That as of such date, the carrier of workers' compensation insurance in North Carolina for employer-defendant was TIG Insurance with Cunningham Lindsey Claim Services as Third-Party Administrator.
6. Plaintiff's average weekly wage was $683.27 with a corresponding compensation rate of $455.74.
7. Defendants filed a Form 60, which was completed and mailed to the North Carolina Industrial Commission on or about June 12, 2002.
8. Plaintiff's workers' compensation claim arises out of a one-vehicle motor vehicle accident, which occurred while she was driving a tractor-trailer for employer-defendant on May 26, 2001.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. This case arises from a one-vehicle accident occurring near Tonopah, Nevada on May 26, 2001. At the time of the accident, plaintiff was married to her co-worker, Eddie Hill. The couple was employed at the time as a truck-driving team and traveled and worked together. When the accident occurred, plaintiff was driving the truck and her husband was resting in the sleeper birth.
2. Plaintiff ran off the road and as she attempted to return to the road, the truck turned over on its side. Plaintiff was transported to Nye Regional Medical Center with chief complaint of severe low back pain and a burning sensation in the right lower limb. The assessment was "acute right lumbosacral radiculopathy probably secondary to acute displacement disc lumbosacral area, muscle spasm of lower back, and back pain." Plaintiff was admitted on May 26, 2001 with instructions of "complete strict bed rest," and discharged on May 28, 2001 with instructions to follow up with her primary care physician if needed and stay out of work for seven days.
3. On June 4, 2001, after returning to West Virginia, plaintiff presented to the emergency room at Bluefield Regional Medical Center with complaints of abdominal pain and back pain. Impression in the medical records indicated "abdominal pain, suspect contusion secondary to recent motor vehicle accident" and "lumbosacral pain, suspect degenerative changes."
4. On June 12, 2001, Dr. David Kelly saw plaintiff as a result of a referral from defendants. In a July 9, 2001 letter to plaintiff, Dr. Kelly noted that the MRI showed "no evidence that you have had a major injury to your back."
5. Plaintiff returned to Bluefield Regional Medical Center emergency room with complaints of back pain on June 16, 2001. An MRI was recommended and done on June 22, 2001 and showed "post surgical and degenerative changes, moderate L4-L5 disc bulging, mild L5-S1 disc bulging, and no disc herniation seen."
6. Dr. Emmet Montgomery saw plaintiff on July 27, 2001 for continued midline back pain and pain in her buttocks. Plaintiff denied pain down her legs and said her bowel movements had been normal and regular. Plaintiff denied abdominal pain but says she has some aches and pains all over. Plaintiff was requesting Vicodin. Impression was low back muscle strain with spasm and plaintiff was told to see Dr. Albert Bartko on August 6, 2001 as scheduled.
7. Mr. Lou Valente, a physician's assistant in Dr. Steven Wittmer's office saw plaintiff August 13, 2001 for anxiety and depressive issues. Dr. Wittmer testified that plaintiff's anxiety and depression, chronic low back pain, and right leg pain were related to the May 26, 2001 motor vehicle accident. However, Dr. Wittmer testified that he never personally treated plaintiff himself and he could find no evidence of Mr. Valente ordering any tests for plaintiff. He also testified that he would defer to the orthopedic physician regarding her knee and back.
8. Dr. Wittmer testified that the fact that plaintiff had called his office approximately 45 times seeking medications did not surprise him and that he was aware plaintiff had placed a lot of phone calls to his office.
9. Dr. Bartko saw plaintiff on August 6, 2001 and recommended an MRI with Gadolinium enhancement and recommended plaintiff see a psychiatrist for possible anxiety and post-traumatic stress disorder. Dr. Bartko also recommended she find a primary care physician to treat her for her reflux.
10. Dr. Bartko continued to see plaintiff, noting on most visits that she showed ratchety or give way type of effort but no true neurologic weakness and highly positive Waddell's signs. Several of Dr. Bartko's notes indicate non-physiologic findings.
11. Dr. Bartko continued to see plaintiff until he released her at maximum medical improvement on October 24, 2001. He found that her bladder and bowel incontinence as well as her intermittent paresthesias and shakiness in her legs were not related to her back injury and that was why he recommended she see someone else regarding those symptoms. Dr. Bartko did not release Plaintiff to return to work and recommended she never leave the house. Dr. Bartko testified that his recommendation that she never work or leave the house was based on "primarily fear of litigation" and that there were no medical findings to support that recommendation. Dr. Bartko assigned Plaintiff a 1% permanent partial impairment of the back.
12. Dr. Bartko referred plaintiff to Thomasville Physical Therapy where she was started on a home exercise program and treated with ice and electrical stimulation in the prone position.
13. Plaintiff visited Baptist Medical Center emergency department on September 12, 2001 and October 2, 2001 for back pain and again on October 30, 2001 for rib pain.
14. Dr. David O'Brien saw plaintiff for epidural injections. The notes indicate that Dr. Bartko referred plaintiff to Dr. O'Brien of Orthopaedic Specialists of the Carolinas.
15. Plaintiff visited the Lexington Memorial Hospital emergency department several times for back pain, head injury due to fall in shower, right leg pain due to a fall, and again on an involuntary commitment petition that did not meet the criteria for admission but noted depression and marital discord. Plaintiff was released and told to follow up with her psychiatrist.
16. On December 4, 2001, plaintiff underwent a functional capacity evaluation on referral from Dr. Bartko. Plaintiff had positive Waddell's signs indicating magnified illness behavior. Plaintiff terminated the functional capacity evaluation before all testing was completed.
17. Defendants referred plaintiff to Dr. Robert Conder for a neurocognitive evaluation. Dr. Conder notes that plaintiff's responses are consistent with somatoform disorder and there appear to be elements of anxiety as a reaction to the accident. He did note the anxiety appeared to be pre-existing also. He went on to note that the somatoform disorder appears to be related to the accident. Dr. Conder noted "a post traumatic stress disorder is very difficult to ascertain due to the questionable validity of her performance on objective, psychometric measures and inconsistent symptom presentation." He also noted histrionic personality traits. Dr. Conder said plaintiff might benefit from a structured chronic pain management program.
18. Defendants assigned a medical vocational case manager, John McGregor. He initially met with plaintiff on June 25, 2002. Mr. McGregor testified that plaintiff called many times concerning her pain medication for which he would refer her to Dr. Spillman. He said plaintiff indicated she experienced so much pain and so many falls around the house that she would go to the emergency room. She told Mr. McGregor that the ER department told her not to come back to Baptist or Thomasville hospital.
19. Mr. McGregor referred Plaintiff to Dr. Spillman for an independent medical evaluation that was done on July 30, 2002. Dr. Spillman told plaintiff to remain off work, continue home exercises daily, and consider a functional restoration program once all other issues were addressed. He also noted that plaintiff was not at maximum medical improvement and ordered an MRI for the pelvis to rule out bleeding secondary to trauma from this accident and a MRI of the right knee to rule out internal derangement that would require surgery. Dr. Spillman recommended that plaintiff see Dr. Feldman, who is a psychologist that deals with industrial injuries, for possible depression and follow with him as indicated.
20. Dr. Spillman testified, and the undersigned finds as fact, that plaintiff's traumas to the low back, right lower extremity, and left lower quadrant abdominal bruising, as well as plaintiff's depression were related to her motor vehicle accident of May 26, 2001. Dr. Spillman went on to say that he was concerned the black outs could be related to the accident and felt it needed to be evaluated, so he referred plaintiff to Dr. Good.
21. Dr. Spillman testified that there were signs of symptom magnification, but that he did not think plaintiff was trying to malinger or deceive him in any way. He felt "she was truly having some distress and that she that was the driving force." Dr. Spillman testified that he did not know the exact etiology of plaintiff's right leg giving way, but he thought it was related to her back injury. He also testified that plaintiff's injury by accident was a substantial contributing factor to her headaches in February 2003. He felt it was a muscle contraction type headache related to the small nerves in the neck called the intracervical chain as well as the other psychological, social, and physiological stressors that were present.
22. Mr. McGregor testified that Dr. Spillman and Dr. Dakoriya were authorized treating physicians. Mr. McGregor testified that plaintiff was not at maximum vocational improvement in October 2002 and that Dr. Spillman and Dr. Feldman recommended plaintiff participate in a functional restoration program, which she completed September 5, 2003. Mr. McGregor said that he did not try a job search for plaintiff prior to September 5, 2003 because of "her psychological and medical physicians recommending further treatment."
23. Dr. Dakoriya testified that the motor vehicle accident was a significant aggravating factor in plaintiff's general anxiety disorder. Dr. Dakoriya also noted problems with plaintiff's husband, stepson, financial problems, workers' compensation, and her leg giving out that could have contributed to plaintiff's general anxiety disorder.
24. Dr. Feldman testified that plaintiff's pain disorder and anxiety disorder to were related to the motor vehicle accident as well as stress factors unrelated to the accident. He also testified that plaintiff was very positive about returning to work and that if she could just return to work, everything would be fine. Dr. Feldman went on to testify that he thought, in retrospect, that the most accurate diagnosis would be pain disorder associated with both psychological factors and a general medical condition.
25. Mr. McGregor, who was tendered as an expert in vocational rehabilitation disability case management with some expertise in truck driving positions, testified that plaintiff reached maximum vocational improvement in September 2003 when she was released to go back to work as a truck driver. He went on to testify that plaintiff developed knee pain during the functional restoration program and saw Dr. Martin for the knee problem. Dr. Martin ordered physical therapy that was approved by Defendants.
26. Dr. Bartko gave Plaintiff a 1% permanent disability rating to the back and Dr. Spillman gave Plaintiff a 2% permanent disability rating to the head.
27. Plaintiff received treatment at various hospital emergency rooms for pain, headaches, and from falls due to her leg giving way.
28. According to the greater weight of the evidence, the numerous emergency room visits from October 2, 2001 until October 29, 2002 were not causally related to the compensable injury.
29. The greater weight of the evidence further shows that plaintiff's bladder and incontinence problems are not causally related to the compensable injury.
30. Dr. Bartko's sarcastic remarks releasing plaintiff from care and indicating that she should never leave her home again, and should never work were not sufficient to constitute a release to return to work. Although Dr. Bartko testified that there were no restrictions based upon medical findings, it would be unreasonable to expect plaintiff to attempt a return to work based on the comments made by Dr. Bartko.
31. The compensable injury aggravated plaintiff's pre-existing psychological conditions.
32. Defense of this claim by defendants was not unreasonable.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident on May 26, 2001. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to temporary total disability compensation at $455.74 a week from May 26, 2001 through the date she returned to work in 2003 following her release from her physicians. N.C. Gen. Stat. § 97-29.
3. Plaintiff's medical care (excluding emergency room treatment from October 2, 2001 until October 29, 2002 and treatment for bladder and incontinence problems) was related to her injury by accident and was required to effect a cure or provide relief, and plaintiff is entitled to have defendants pay for her medical treatment, including psychological treatment. N.C. Gen. Stat. § 97-25.
4. Plaintiff is entitled to be paid for her 1% permanent disability rating to the back. N.C. Gen. Stat. § 97-31.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at $455.74 a week from May 26, 2001 through the date she returned to work in 2003 following her release from her physicians, subject to an attorney's fee set out below.
2. Defendants shall pay for medical treatment as enumerated herein.
3. Defendants shall pay plaintiff for her 1% permanent disability rating to the back (3 weeks) subject to an attorney's fee set out below.
4. Plaintiff's counsel is entitled to 25% of the amounts awarded to plaintiff in Paragraphs 1 and 3 of this Award. This amount shall be deducted from the amount awarded to plaintiff in Paragraphs 1 and 3 of this Award and shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs.
This the ___ day of April, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER